ILLINOIS BELL TELEPHONE COMPANY, Petitioner-Appellant, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees.

Third District    No. 3—95—0898

Opinion filed July 22, 1996.—Modified on denial of rehearing August 27, 1996.

Stephen J. Mattson (argued), Michele Odorizzi, Christian F. Binning, and Ashish S. Prasad, all of Mayer, Brown & Platt, and Louise A. Sunderland, of Illinois Bell Telephone Company, both of Chicago, for appellant.

James E. Ryan, Attorney General, of Chicago (John P. Kelliher (argued), Special Assistant Attorney General, of counsel), for appellee Illinois Commerce Commission.

C. Edward Watson II (argued), of Chicago, for appellee AT&T Telecommunications of Illinois, Inc.

Clyde Kurlander (argued), of Chicago, for appellee MCI Telecommunications Corporation.

PRESIDING JUSTICE BRESLIN delivered the opinion of the court:

Illinois Bell Telephone Company (Ameritech) filed the instant petition for appellate review of the Illinois Commerce Commission's (Commission's) ruling that certain services it offered to business customers are noncompetitive within the meaning of section 13—502(b) of the Illinois Public Utilities Act (Act), 220 ILCS 5/13—502(b) (West 1994). We hold that the Commission's interpretation of section 13—502(b) was not clearly erroneous. We therefore defer to the Commission's interpretation. In addition, we hold that the Commission's findings are supported by substantial evidence in the record. For these reasons, we affirm.

In 1995, Ameritech reclassified certain services it provided to business customers from noncompetitive to competitive. These services included band B calls (calls to a party between 8 and 15 miles away), band C calls (calls to a party over 15 miles away), credit card calls, and operator assistance services. According to the Act, a service is competitive only if the service, its functional equivalent or a substitute service is reasonably available to a defined group of

customers or within a defined geographic area. 220 ILCS 5/13—502(b) (West 1994). By classifying these services as competitive instead of noncompetitive, Ameritech could change its prices with fewer procedural obstacles and less scrutiny from the Commission. After classifying the services as competitive, Ameritech raised its rates on band C calls and increased its surcharges on calling card calls.

After Ameritech reclassified the services, the Commission initiated an investigation proceeding. AT&T and MCI intervened in this proceeding, arguing that the services should be classified as noncompetitive. At a hearing before the Commission hearing examiner, Ameritech presented evidence that it had lost 13.4% of its market share for bands B and C services to competitors such as AT&T and MCI (IXCs). The only difference between Ameritech's bands B and C service and that provided by the IXCs is the method of gaining access to the service. Ameritech customers access the service by dialing "1" plus the 7- or 10-digit phone number. The IXCs' customers access their services by dialing a five-digit access code prior to dialing the 7- or 10-digit telephone number. Ameritech introduced evidence that 40% to 50% of its business usage is attributable to customers who have phones that can be programmed for automatic access to IXC services. In addition, some customers have installed dedicated access lines which eliminate the need to dial access codes, and some customers have speed dialing features on their phones that permit one-button access to IXC services.

AT&T and MCI presented witnesses who testified that the need to dial codes or employ special technology in order to access their services hindered their ability to compete with Ameritech. The IXCs also presented evidence that Ameritech's loss of business can be attributed to the loss of only a few large volume customers.

The IXCs also offered the same operator assistance and calling card services that Ameritech offered. Ameritech presented evidence that its revenues for these services have been declining while overall market revenues have been on the rise. As in the bands B and C services, the only difference between Ameritech's service and the IXCs' service was the method of access. While some IXC customers have direct access to the IXCs' operators, others must dial an "800" number to access the IXCs' operators.

After the hearing, the Commission hearing examiner issued a proposed order recommending that Ameritech be permitted to classify as competitive all of its operator assistance and calling card services as well as its bands B and C services for business customers with three or more lines. The Commission rejected this proposed order. The differences in the methods of accessing the competing bands

B and C services caused the Commission to conclude that the IXCs' services were not functionally equivalent to or a substitute for Ameritech's services. Because Ameritech held 86.6% of the market share, the Commission found that the IXCs' services were not reasonably available to Ameritech's customers.

With regard to the operator assistance and calling card services, the Commission found that the IXCs had a greater market share than they did in the market for bands B and C service. However, the Commission noted that the data regarding the competitive nature of this service were of recent origin and did not conclusively show an assured and effective competitive structure. The Commission thus concluded that all of the services at issue in this proceeding should be classified as noncompetitive. The Commission further ordered Ameritech to roll back its price increases and refund amounts charged in excess of the previous rates. The Commission denied Ameritech's petition for rehearing and Ameritech appeals.

The first issue on appeal is whether the Commission properly interpreted section 13—502(b) of the Act.

When interpreting a statute, a court's primary objective is to ascertain and give effect to the intent of the legislature by considering the plain and ordinary meaning of the statutory language in the overall context of the reason and necessity for the statute and its stated purpose. *MCI Telecommunications Corp. v. Illinois Commerce Comm'n*, 168 Ill. App. 3d 1008, 1012, 523 N.E.2d 143, 146 (1988). The interpretation of a statute by an agency charged with its administration is accorded great deference (*MCI*, 168 Ill. App. 3d at 1012, 523 N.E.2d at 146) and should only be reversed if it is erroneous (*O'Hare-Midway Limousine Service, Inc. v. Baker*, 232 Ill. App. 3d 108, 596 N.E.2d 795 (1992)).

■ Section 13—502(b) of the Act is part of the Universal Telephone Service Protection Law of 1985. 220 ILCS 5/13—101 *et seq.* (West 1994). As part of this legislation, the General Assembly found that competition in the telecommunications industry may lead to reduced prices for consumers, but protection of the public interest requires continued regulation of the telecommunications industry. 220 ILCS 5/13—102(c), (d) (West 1994). Accordingly, the legislature declared that it is the policy of the state of Illinois that, when consistent with the protection of consumers of telecommunications services and the furtherance of other public interest goals, competition should be permitted to function as a substitute for certain aspects of regulation. 220 ILCS 5/13—103(b) (West 1994). To facilitate competition in the telecommunications industry, the legislature enacted section 13—502(b), which provides that a telecommunications carrier may

classify a service as competitive only if and only to the extent that a competing provider has made functionally equivalent or substitute services reasonably available to a defined group of customers. 220 ILCS 5/13—502(b) (West 1994). The legislature did not define the terms "functionally equivalent," "substitute services" or "reasonably available."

■ Ameritech first argues that the Commission erred by interpreting the "reasonably available" language in section 13—502(b) to require a showing that the competing service provider has captured a portion of the market share that is large enough to indicate that a fully developed competitive market has emerged. Ameritech claims that since all of its customers have the opportunity to purchase the services from the IXCs, the services are reasonably available. According to Ameritech, a service may be classified as competitive under section 13—502(b) as soon as a competing, functionally equivalent service is made available to the customers.

Because the meaning of the term "reasonable" varies depending upon the context in which it is used, this language is ambiguous. The Commission was thus required to ascertain the intent of the legislature by considering the reason and necessity for the statute and its stated purpose. According to the legislative findings expressed in the Act, competition in the telecommunications industry may lead to reduced prices for consumers, but protection of the public interest requires continued regulation of the telecommunications industry. 220 ILCS 5/13—102(c), (d) (West 1994). Based on the Act's declaration that competition should be allowed to function as a substitute for regulation only when consistent with the protection of consumers, 220 ILCS 5/13—103(b) (West 1994), it was reasonable for the Commission to conclude that the legislature intended to allow a provider to classify a service as competitive only when competition had developed to the extent that regulation was no longer necessary. Allowing a provider to classify a service as competitive prior to the development of a competitive market for the service would enable the provider to enjoy the benefits of a monopoly without the concomitant regulation which the legislature has declared is necessary to protect the interests of consumers. Accordingly, the Commission's conclusion that it must examine actual market behavior in order to determine whether a competing service is reasonably available was not clearly erroneous, and we defer to this interpretation.

■ Next, Ameritech argues that the Commission erroneously interpreted the terms "functionally equivalent" and "substitute services." According to Ameritech, the IXCs' services provide the same function as its services. While recognizing that customers must take

additional steps to access the IXCs' services, Ameritech claims that the differences in the method of access are insignificant and could be further minimized or eliminated through the use of special technological devices. Accordingly, Ameritech contends that access to the IXCs' services was equivalent for purposes of section 13—502(b).

Again, the legislature did not define the terms "functionally equivalent or substitute service," and the Commission had to determine the intent of the legislature by considering the reason and necessity for the statute and its stated purpose. Based on the findings and policy expressed in the Act, the Commission could reasonably conclude that a competing service is not a functionally equivalent or substitute service if a barrier to accessing that service precludes effective competition. In light of the evidence that the need to dial access codes or install specialized equipment in order to access the IXCs' services hindered the IXCs' ability to compete with Ameritech, we cannot say that the Commission's determination was clearly erroneous. Accordingly, while the Commission's construction of the disputed language may not be the only reasonable construction, we defer to the Commission's interpretation.

Ameritech points out that in *MCI Telecommunications Corp. v. Illinois Commerce Comm'n*, 168 Ill. App. 3d 1008, 523 N.E.2d 143 (1988), the court found that AT&T's long distance services were functionally equivalent to MCI's long distance services even though users had to dial an 800 number to access MCI's services. However, as Ameritech notes in its brief, only 30% of AT&T's customers had to use the 800 number to access MCI's services and some of AT&T's customers could access MCI's services without dialing any access number. In the instant case, the evidence established that every customer must dial an access code or employ special technology in order to access the IXCs' services. Moreover, the *MCI* court did not hold that the need to dial access codes could never form the basis for a Commission finding that a competing service is not functionally equivalent. Therefore, *MCI* does not control the outcome of this case.

Citing *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 651 N.E.2d 1089 (1995), Ameritech argues that this court should give less deference to the Commission's interpretation of section 13—502(b) because it was a drastic departure from the Commission's past interpretations. However, in the prior Commission rulings cited by Ameritech, the issue of whether functionally equivalent services were reasonably available to consumers was not contested. Moreover, because we believe the Commission's interpretation of section 13—502(b) is reasonable in light of the legislative findings and the stated purpose for the statute, we would affirm the Commission's decision in this case even if we applied a less deferential standard.

■ Ameritech next claims that the Commission erred by ignoring the plain meaning of the statutory language and focusing exclusively on the legislative findings and policy expressed in the Act. However, we agree with the *MCI* court that the terms of section 13—502(b) "must be considered in their overall context with a view to the reason and necessity for the statute and the purpose to be achieved thereby." *MCI Telecommunications Corp. v. Illinois Commerce Comm'n*, 168 Ill. App. 3d 1008, 1012, 523 N.E.2d 143, 146 (1988). Accordingly, we reject Ameritech's argument.

■ The next issue is whether the Commission's decision was supported by substantial evidence.

On appeal, an appellate court will reverse a Commission decision only if the appellant proves that the Commission's findings are not supported by substantial evidence based on the entire record. 220 ILCS 5/10—201(e)(iv) (West 1994); *Continental Mobile Telephone Co. v. Illinois Commerce Comm'n*, 269 Ill. App. 3d 161, 171, 645 N.E.2d 516, 523 (1994). To meet this standard, the appellant must show that the opposite conclusion is clearly evident. *Continental Mobile Telephone Co.*, 269 Ill. App. 3d at 171, 645 N.E.2d at 523.

First, Ameritech claims that there is no record evidence to support the Commission's finding that the IXCs' services are not functionally equivalent or substitute services. However, Ameritech conceded that customers must dial an access code or utilize special technology to access the IXCs' services. Accordingly, the method of accessing the competing services was fundamentally different. This evidence supports the Commission's conclusion that the IXCs' services are not functionally equivalent or substitute services.

Ameritech also claims that there was no record evidence to support the Commission's conclusion that the market for the services in question lacks effective competition. However, Ameritech presented evidence that it retained 86% of the market share for bands B and C services. In addition, AT&T presented evidence that would support the conclusion that Ameritech has lost only a small number of relatively large volume customers. With respect to operator and calling card services, Ameritech presented evidence that its revenues have been declining while overall market revenues have been on the rise. However, the evidence did not clearly establish that competition in the market for these services is sufficient to function as a substitute for regulation. Accordingly, we hold that the Commission's decision was supported by substantial evidence in the record.

For the foregoing reasons, the decision of the Illinois Commerce Commission is affirmed.

Affirmed.

McCUSKEY and SLATER, JJ., concur.